John MUNOZ, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18488.

United States Court of Appeals
Ninth Circuit.

Nov. 29, 1963.

Nubar Tashjian, San Francisco, Cal.,
for appellant.

Cecil F. Poole, U. S. Atty., and Jerrold
M. Ladar, Asst. U. S. Atty., San Fran-
cisco, Cal., for appellee.

Before HAMLEY, JERTBERG and
MERRILL, Circuit Judges.

JERTBERG, Circuit Judge:

Following trial to a jury, appellant was
convicted of the offense of having
knowingly and fraudulently sold and fa-
cilitated the sale, concealment and trans-
portation of heroin at San Francisco,
California, on or about December 11,
1961, in violation of the provisions of
21 U.S.C. § 174, and sentenced to the

**24**

custody of the Attorney General of the United States for a period of eight years.

On this timely appeal, appellant specified as errors on the part of the District Court:

1. The admission into evidence of a box of blue stationery, after denial of appellant's timely motion to suppress the same and over appellant's timely objections, on the ground that the box of stationery was the product of an unreasonable search and seizure in violation of the Fourth Amendment to the Constitution, and not incident to a lawful arrest;

2. The denial of appellant's motion to hold a courtroom demonstration of an electronic device called a "Fargo Device" which transmits voice by radio; and

3. The admission into evidence over appellant's timely objections of statements or admissions made by appellant shortly after his arrest on the evening of December 22, 1961, because of the delay of the arresting officers in taking appellant, without unnecessary delay, before the nearest available United States Commissioner or magistrate contrary to the provisions contained in Rule 5(a), Federal Rules of Criminal Procedure.

In order to place these specifications of error in proper focus, it is necessary to detail the background events leading up to appellant's arrest on the evening of December 22, 1961. On December 11, 1961, four Federal Narcotics Agents, acting upon information given to them by an informer, one Bob Miller alias Bob Greenberg, a convicted felon, set up plans to purchase heroin. At that time the informer was wholly unacquainted with the appellant, had never seen him, and never talked to him, had no knowledge of his place of residence and had had no transactions of any kind with him. At that time the narcotic agents were unaware of the existence of the appellant, did not know his name, had never seen or talked to him, and had no knowledge of any prior involvement by him in narcotic transactions. At approximately 6:30 o'clock p. m. on that day, Agent Lang placed a telephone call to Douglas 2–9741, which telephone was listed to a hotel at 115 Market Street (near the waterfront), and was located on the fourth floor therein. When the call was answered, the Federal Agent asked for "Frank." A few moments later an unidentified person answered the phone and said, "This is Frank, what do you want?" The agent told the party on the line that he wanted to pick up some heroin. The response was, "Well, I can get you any amount of heroin you want up to one hundred ounces." An arrangement was then made for the purchase and sale of approximately one gram. The unidentified person said he would leave the heroin in the coca cola vending machine in the lobby of the hotel and the buyer should leave the money in the machine and pick up the heroin. Agents Lang and Fahey accompanied the informer to his apartment where he was searched for narcotics. None was found. The informer was then equipped with an electronic device called a "Fargo Device" which transmits voice by radio, and furnished with $800.00 in marked money. The informer drove his own automobile and parked the same in front of the hotel at 115 Market Street. Agents Lang and Fahey followed in their own automobile and parked the same on Market Street across from the hotel. In the automobile of the agents was a portable electronic listening device. Narcotics Agent Lee was earlier dispatched to maintain surveillance on the sidewalk in front of the hotel. Prior to the entry of the informer in the hotel, Lee saw a person in the lobby of the hotel whom he identified at the trial as being the appellant. Agents Lang and Fahey were seated in the automobile across the street when they saw the informer enter the lobby. The informer proceeded to the coca cola machine. The informer met a person at the coca cola machine whom he identified at the trial as appellant. Agent Lee saw the informer and the person later identified by him as the appellant, near the coca cola machine. The informer looked inside the machine. Appellant

asked "Where is the money?" The informer said "Wait till I find the stuff." The informer removed a blue envelope from the machine containing nine small blue packages. He then paid appellant $50.00. The informer then left the hotel. The transaction consumed about thirty seconds during which persons entered and left the lobby. Lang, over the listening device in his automobile, heard two voices. One said, "Give me the money", then the other voice which Lang identified as being the voice of the informer said "Wait till I get the stuff," and "Here's the money." Lang testified that the other voice which he heard on the listening device was the same voice as the person called "Frank" whom he had talked to on the phone. None of the narcotics agents witnessed the transfer of the money or the envelope. After leaving the hotel, the informer drove his own automobile to a bar located on a pier on the waterfront. He was followed by Agents Lang and Fahey. Agent Lang and the informer proceeded to the men's room of the bar where the informer delivered the blue envelope and $575.00 of marked money. Lang examined the contents of the packages which contained white powder which he believed to be heroin.

No effort was made by the narcotic agents to obtain a warrant for the arrest of appellant.

The record is silent as to any activity of the narcotic agents until December 22, 1961 when, at about 10:30 o'clock a. m., of that day, Lang observed appellant working at the establishment of the Del Monte Meat Company in San Francisco. Lang left the premises. He made no effort to secure a warrant of arrest. He returned to the premises about 12:30 p. m. with other agents and the premises were "staked out." In the late afternoon of that day appellant left the premises at the end of his day's employment without being observed by the officers. At about 5:00 p. m., on December 22nd, Lang was informed by his office that appellant lived at the Gordon Hotel, 112 Seventh Street, San Francisco. In the

meantime Agent Fahey had proceeded to the hotel and discovered that appellant was registered there. He secured a pass-key from the hotel clerk to appellant's room. Appellant was not in his room. Later Fahey was joined by Agent Lang and two San Francisco Police Department officers. The clerk of the hotel gave the officers the key to a vacant room nearby. At about 7:00 o'clock p. m., the officers were informed by the clerk that appellant had gone to his room. The officers proceeded to appellant's room. Agent Lang testified: "I believe that I knocked and we stated we were federal agents, and he was under arrest." He further testified that when he entered the room was dark and appellant appeared to be getting out of the bed. The entry into the room was described by Agent Fahey as follows:

"Agent Lang and I and the two officers went to the door. Lang was in front of me. He knocked and spoke, and I can hear movement in the room. I am impatient. I said 'Get out of the way, Lang,' and put the key in the door and opened it and went in with my flashlight. The defendant was sitting on the bed. I told him he was under arrest and not to move. * * *

"Q. Do you recall hearing Mr. Lang at that time, in front of the doorway of defendant's room state outright the purpose of his visit?

"A. Well, I recall him speaking out, but I couldn't quote his words. I am intent on entering and intent on——

"Q. Was the key provided you?

"A. Yes. Getting in and getting in quickly. I wasn't lingering at the door."

The officers handcuffed the appellant, searched his room and his person, but found no narcotics, marked money, arms or weapons. They found a box of blue stationery which was similar to the blue wrapped packages and the blue envelope obtained from the informer on the night of December 11th, and which, at the trial,

was admitted into evidence over appellant's objection and appellant's motion to suppress.

At no time from December 11th did the narcotic agents obtain or attempt to obtain either a warrant of arrest for appellant, or a search warrant to search his room.

After the arrest appellant was interrogated for approximately one-half hour at the hotel, and for some time thereafter at the office of the narcotic agents, during which appellant made certain admissions and incriminatory statements which were admitted into evidence at the trial over appellant's objections.

No attempt whatever was made to bring appellant before a United States Commissioner or magistrate until December 26, 1961, the assigned reason being that Saturday, Sunday, and Christmas intervened.

Title 26 U.S.C. § 7607, among other things provides that Agents of the Bureau of Narcotics of the Department of the Treasury are authorized to:

> "make arrest without warrant for violations of any law of the United States relating to narcotic drugs * * * where the violation is committed in the presence of the person making the arrest, or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

■ We need not decide in this case whether the officers who arrested appellant had reasonable grounds to believe that the appellant had committed or was committing a violation of the narcotic laws, nor need we decide whether any of the rights of appellant were violated by the failure of the officers, from December 22 to December 26, 1961, to take appellant "without unnecessary delay" before the nearest available Commissioner, as required by the provisions of Rule 5(a) of the Federal Rules of Criminal Procedure, because we are satisfied from our review of the record that the arresting officers violated the provisions of Title 18 U.S.C. § 3109 which provides:

> *"Breaking doors or windows for entry or exit*
>
> "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

■ While it is true that the officers did not break open the door to appellant's room, we believe that the entry into his room by a passkey obtained from the clerk of the hotel amounts to the same thing. It is clear from the quoted testimony of Agent Fahey that the knock on the door and the announcement by Agent Lang, and the entry, were practically instantaneous. Entry to the appellant's room in the manner described completely ignores and destroys the reasons for and the purposes behind the provisions of the above quoted section. As stated in Miller v. United States, 357 U.S. 301, at p. 313, 78 S.Ct. 1190 at p. 1197, 2 L.Ed.2d 1332 (1958):

> "The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. Congress, codifying a tradition embedded in Anglo-American law, has declared in § 3109 the reverence of the law for the individual's right of privacy in his house.[12] Every householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house. The petitioner could not be lawfully arrested in his home by officers breaking in without first giving him notice of their authority and purpose. Because the petitioner did not receive that notice before the officers broke the door to

invade his home, the arrest was unlawful, and the evidence seized should have been suppressed.

---

"12. Compliance is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder. See concurring opinion in McDonald v. United States, 335 U.S. 451, 460–461 [69 S.Ct. 191, 93 L.Ed. 153]."

In Wong Sun v. United States, 371 U.S. 471, at page 482, 83 S.Ct. 407, at page 414, 9 L.Ed.2d 441 (1963), the Supreme Court stated:

"We noted in that case [Miller v. United States, 357 U.S. 301 [78 S.Ct. 1190, 2 L.Ed.2d 1332]] that lawfulness of an officer's entry to arrest without a warrant 'must be tested by criteria identical with those embodied in 18 U.S.C. § 3109, which deals with entry to execute a search warrant.' 357 U.S., at 306 [78 S.Ct. 1194]. That statute requires that an officer must state his authority and his purpose at the threshold, and be refused admittance, before he may break open the door."

We hold under the facts of this case that the arrest of appellant was unlawful and that the search of appellant's room incidental thereto was likewise unlawful. The District Court erred in receiving in evidence the box of blue stationery as well as the statements or admissions made by the appellant after his arrest.

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in Silverman v. United States, 365 U.S. 505 [81 S.Ct. 679, 5 L.Ed.2d 734], that the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects.' Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. McGinnis v. United States [1 Cir.], 227 F.2d 598. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." Wong Sun v. United States, supra, p. 485 of 371 U.S., p. 416 of 83 S.Ct., 9 L.Ed.2d 441.

Since the judgment of conviction must be reversed, and for the guidance of the District Court in the event of a retrial, we believe it proper to state that in our view the District Court erred in denying appellant's motion to hold a courtroom demonstration of the "Fargo Device." While appointed counsel for the appellant did not persist in insisting upon a ruling on his motion, the record is clear that such persistence would have been futile. In this connection the court stated to counsel for the appellant "If you want further cross examination, I will allow it, but I don't believe in demonstrations. I have had too much experience with them and it's not the thing to do." The District Court also expressed the view that the demonstration might be "prejudicial to your client." It is to be recalled that when the alleged sale took place the participants were in the hotel lobby. Agent Lang was in his automobile parked across Market Street from the hotel. Only a few words were spoken by the participants, and Agent Lang testified that he recognized appellant's voice through the listening device. In view of the critical nature of Agent Lang's testimony, we believe that the appellant was entitled to have the jury weigh Agent Lang's testimony on this point in the light of whatever may have resulted from the demonstration.

The judgment of conviction is reversed. If a new trial shall be had, the same shall be conducted in the light of the views herein expressed.